**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
WESTERN DIVISION

| | | |
|---|---|---|
| OPERATING ENGINEERS LOCAL NO. 101 PENSION FUND, *et al.* | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 01-0087-CV-W-SOW |
| K.C. EXCAVATING & GRADING, INC.; and G & C EXCAVATING, L.L.C., | ) | |
| Defendants. | ) | |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS

Martin W. Walter, # 48867
**BLAKE & UHLIG, P.A.**
2500 Holmes St.
Kansas City, MO 64108

**ATTORNEYS FOR PLAINTIFFS**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**I. STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II. STATEMENT OF UNCONTROVERTED MATERIAL FACTS** . . . . . . . . . . . . . . . . 2

**III. STANDARD FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**IV. ARGUMENT AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**A. Plaintiff Funds Are Entitled To Summary Judgment On Their Claim For Recovery Of Delinquent Fringe-Benefit Contributions Against Defendants K.C. Excavating & Grading, Inc. And G & C Excavating, L.L.C.** . . . . . . . . . . . . 21

**1. Common Control** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**2. Failure to Maintain Separate Legal Identities** . . . . . . . . . . . . 26

**3. Fraudulent Intent** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**4. Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**B. Plaintiff Union Is Entitled To Summary Judgment On Its Claim For Recovery of Unpaid Union Wages And Industry Advancement Funds Against Defendants K.C. Excavating & Grading, Inc. And G & C Excavating, L.L.C.** . . . . . . . . . . . . 36

**V. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Blood v. Pan American World Airways, Inc.*,
1991 WL 251643 (N.D.Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Boards of Trustees of the Bricklayers Local 74*
*Fringe Benefit Funds v. Michael J. Vorkapic, Inc.*,
2001 WL 649501 (N.D.Ill. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34

*Bufco Corp. v. NLRB*,
147 F.3d 964, 968 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Cancun Adventure Tours, Inc. v. Underwater Designer Co.*,
862 F.2d 1044 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Caplin v. Medine's Expo Serv., Inc.*,
1996 WL 51214 (N.D. Ill. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cement and Concrete Workers Dist. Council Welfare Fund v. Lollo*,
35 F.3d 29 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Central States, Southeast and Southwest Areas Pension Fund v. Sloan*,
902 F.2d 593 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Collet v. American Nat. Stores*,
708 S.W.2d 273 (Mo. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cooper v. United States*,
827 F.Supp. 1309 (E.D. Mich. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Establissement Tomis v. Shearson Hayden Stone, Inc.*,
459 F.Supp. 1355 (S.D.N.Y. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

*General Longshore Workers, Local 1988 v. Pate Stevedore Co.*,
1993 WL 603297 (N.D. Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Get Away Club, Inc. v. Coleman*,
969 F.2d 664 (8th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc.*, 104 F.3d 1050 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 27, 33

*Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d 926 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 38

*Hollowell v. Orleans Regional Hosp., LLC*, 217 F.3d 379 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Horton Dairy, Inc. v. United States*, 986 F.2d 286 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kansas City Southern Transport Co., Inc. v. Teamsters Local Union #41*, 126 F.3d 1059 (8th Cir. 1997); 29 U.S.C. § 185(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Laborers' Pen. Trust Fund v. Weinberger Homes*, 872 F.2d 702 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Radaszewski by Radaszewski v. Telecom Corp.*, 981 F.2d 305(8th Cir. 1992), *cert. denied*, 113 S.Ct. 2338 (1993) . . . . . . . . . . . . . . . . . 35

*Ragan v. Tri-County Excavating, Inc.* 62 F.3d 501 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Rock Drilling Local Union No. 17 v. Mason & Hanger Co.*,
217 F.2d 687 (2d Cir. 1954), *cert. denied*, 349 U.S. 915 (1955) . . . . . . . . . . . . . . . . . . . 37

*Textile Workers Union v. Lincoln Mills*,
353 U.S. 448 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Thomsen v. United States*,
887 F.2d 12 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Trustees of Pension, Welfare, and Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co., Inc.*,
995 F.2d 785 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
1997 WL 756602 (D.Kan. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Van Diviner*,
822 F.2d 960 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 30

*Wausau Business Ins. Co. v. Turner Const. Co.*,
141 F.Supp.2d 412 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Williams v. City of St. Louis*,
783 F.2d 114 (8th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATUTES**

29 U.S.C. § 1002(21) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. § 1002(37) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

29 U.S.C. § 1132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21, 22

29 U.S.C. § 1145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21, 22

29 U.S.C. § 185 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 36, 37

**ARTICLES**

Eric Fox, *Piercing the Veil of Limited Liability Companies*, 62 Geo. Wash. L. Rev. 1143 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Mark A. Olthoff, *Beyond the Form--Should the Corporate Veil be Pierced?*, 64 UMKC L. Rev. 311 (Winter 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24



Case 4:01-cv-00087-SOW Document 36 Filed 12/28/01 Page 6 of 44

## I. STATEMENT OF THE CASE

This is an action to recover unpaid fringe-benefit contributions and attendant damages, pursuant to §§ 502 and 515 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1132 and 1145, and § 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185, and to recover unpaid union wages, pursuant to § 301 of LMRA, 29 U.S.C. § 185.

At all times material to this action, Defendant K.C. Excavating & Grading, Inc. (hereinafter "K.C. Excavating"), a company engaged in construction contracting, was bound to two collective bargaining agreements with the Union. K.C. Excavating is run by its two officers, Garry and Christina Wyatt, a married couple. In an attempt to avoid its continuing obligations to creditors like the Funds and the Union, the Wyatts all but shuttered K.C. Excavating in or around January 2001 and diverted all its work to a new alter ego, G & C Excavating, L.L.C. ("G & C Excavating"). G & C Excavating is not signatory to any union contracts.

G & C Excavating, which is owned by Christina Wyatt and run jointly by the Wyatts, began operating at the time K.C. Excavating ceased doing business. The new company is a transparent sham, started to perpetrate a fraud against the Plaintiffs, with whom the Wyatts deny a binding contractual obligation--this Court's opinion to the contrary notwithstanding. G & C Excavating continues to operate as a shell through which the Wyatts flout their financial obligations.

The transition from K.C. Excavating to G & C Excavating was virtually seamless. At the time K.C. Excavating was winding down, G & C Excavating miraculously emerged, as though sprung from the head of Zeus, full-grown and ready to do business. Since its inception, G & C Excavating has performed the same type of work K.C. Excavating used to do. G & C Excavating employs the same workers formerly employed by K.C. Excavating. G & C Excavating uses substantially only the

equipment, vehicles, and supplies owned by K.C. Excavating, some of which are leased at no cost to G & C Excavating. For months, the two companies shared a post office box and office space, which G & C Excavating was allowed to rent at no charge. They continue to share a computer system and bookkeeping/payroll software. The two companies have commingled their funds with one another and with the Wyatts' personal assets. The Defendants have also engaged in non-arm's-length transactions and have failed to observe corporate and limited-liability formalities which would establish their independent status.

Plaintiffs allege that Defendants K.C. Excavating and G & C Excavating, as alter egos, are jointly and severally liable under the two collective bargaining agreements. These agreements obligate Defendants to timely remit fringe-benefit contributions to the Plaintiffs based on the number of payroll hours worked by employees covered by these agreements. Plaintiffs further allege that Defendants have failed to meet their obligations since September 2000, and, as a result, are currently indebted to the Plaintiffs for all delinquent fringe-benefit contributions and related damages sought in this action. In addition, the Plaintiff Union alleges that Defendants violated the collective bargaining agreements in bypassing the Union's hiring hall to hire their current operating engineers,[1] who are covered by the agreements.

## II. STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1. Each of the Plaintiff Funds is a "multiemployer [fringe benefit] plan" within the meaning of § 3(37) of ERISA, 29 U.S.C. § 1002(37), in that each is a plan: (i) to which more than one employer is required to contribute; (ii) which is maintained

[1] Operating engineers are tradesmen charged with operating and maintaining the heavy equipment (e.g., cranes, excavators, bulldozers, and track hoes) on construction sites.

pursuant to several collective bargaining agreements between the Union and more than one employer; and (iii) which satisfies such other requirements as the Secretary of Labor may prescribe by regulation. (Attachment A, Wilson Aff., at ¶ 3.)

2. Each of the Plaintiff Funds is administered and maintained jointly by employer trustees and union trustees. Each Plaintiff trustee is a fiduciary within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). (Wilson Aff. at ¶ 4.)

3. The Funds are funded by contributions from several employers, making them each multi-employer funds. Each of the several employers who contribute to the Funds is required to make contributions to the Funds pursuant to collective bargaining agreement(s) with the Union. The Funds are maintained pursuant to these collective bargaining agreements, which are negotiated, secured, and executed by the Union. Each Fund has been continually in existence, and has been adopted by the Union and the participating employers, since before September 2, 1974. (Wilson Aff. at ¶ 5.)

4. The Plaintiff Union is a labor organization in which employees participate and which exists for the purpose of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, and conditions of work. The Union negotiates collective bargaining agreements which establish wage rates and fringe benefits for operating engineers performing work covered by those agreements. The Union is also sponsor of the Funds. (Attachment B, Bennett Aff. at ¶ 2.)

5. Defendant K.C. Excavating & Grading, Inc. is a contractor that performs construction work in the nature of heavy commercial excavating and grading. (Attachment C, G. Wyatt Depo. II (Oct. 24, 2001), at 10:8-10:10.)

6. Garry Wyatt and his wife, Christina Wyatt, are the only officers of K.C. Excavating & Grading, Inc. Garry is President and sole shareholder of the corporation; Christina is Secretary of the corporation. (G. Wyatt Depo. II, at 10:11-10:16; Attachment D, Christina Wyatt Depo. at Exh. 74, p. 2; Attachment H, K.C. Excavating Supp. Resp. to Interrogs. at "Verification" page.)

7. Garry and Christina Wyatt each possess authority to sign checks on K.C. Excavating's bank accounts. (G. Wyatt Depo. II, at 60:7-60-18; C. Wyatt Depo. at 53:3-55:16 and at Exh. 80.)

8. Garry Wyatt has been working at the operating engineering trade for over ten years, and has owned an excavating business for around six years. (G. Wyatt Depo. II, at 30:3-30:7; C. Wyatt Depo., at 8:23-9:4.)

9. In a deposition taken by Plaintiffs in connection with a previous ERISA collection case brought in this court, *Operating Engineers Local No. 101 Pension Fund, et al. v. K.C. Excavating & Grading, Inc.*, Case No. 98-0452, Garry Wyatt testified that, as far as he was concerned, he was not bound to any collective bargaining agreements with the Operating Engineers Local Union No. 101. (Attachment E, Garry Wyatt Depo. I, 10:10-14:4, 18:14-18:20.)

10. Judge Sachs disagreed, holding K.C. Excavating & Grading, Inc. bound to the terms of two collective bargaining agreements with the Operating Engineers Local Union No. 101: (1) the Agreement between the Associated General Contractors of Missouri and Operating Engineers Local No. 101 ("AGC agreement"), effective May 1, 1998, through April 30, 2002; and (2) the Individual Heavy Contractors Agreement

("IHC agreement"), effective March 30, 1998 through March 31, 2002. (Attachment F, Order, 2/24/00, Case No. 98-0452, Doc. #37, pp. 9-11; Garry Wyatt Depo. II at Exhs. 1 and 2.)

11. In spite of Judge Sachs's decision, Garry Wyatt continues to claim that K.C. Excavating & Grading, Inc. is not bound to any agreements with the Operating Engineers Local Union No. 101. Indeed, Mr. Wyatt testified that he was forced against his will by Local 101 and the undersigned attorney to make contributions under the AGC and IHC agreements. (Garry Wyatt Depo. II, at 12:7-15:12.)

12. At all times material to this action, the IHC agreement has obligated employers to submit fringe benefit contributions, at certain prescribed rates, to the Health & Welfare Fund, the Pension Fund, the Apprenticeship Fund, the Vacation Fund, and the Heavy Constructors Association of the Greater Kansas City Area Industry Advancement Fund (hereinafter "HCA Advancement Fund") for each hour worked by employees covered under the agreement. Employers are also obligated, by the contract's terms, to transmit to the Union a working assessment (also known as "supplemental dues") deducted from the wages of each covered employee. Employers also must complete and submit to the Plaintiffs written work reports, commonly referred to as Employers Contribution Reports, which disclose the number of employees, the hours worked, and the amounts payable to the Union and the respective Funds on each employee's behalf. (G. Wyatt Depo. II at Exh. 2, at Article XIV, ¶ 8, Article XVIII, ¶¶ 1-8, and Article XIX.)

13. At all times material to this action, the AGC agreement has obligated employers to submit fringe benefit contributions, at certain prescribed rates, to the Health & Welfare Fund, the Pension Fund, the Apprenticeship Fund, the Vacation Fund, and the Missouri Construction Industry Advancement Fund (hereinafter "MCI Advancement Fund") for each hour worked by employees covered under the agreement. Employers are also obligated, by the contract's terms, to transmit to the Union supplemental dues deducted from the wages of each covered employee. Employers also must complete and submit to the Plaintiffs written work reports, commonly referred to as Employers Contribution Reports, which disclose the number of employees, the hours worked, and the amounts payable to the Union and the respective Funds on each employee's behalf. (G. Wyatt Depo. II at Exh. 1, ¶¶ 14.1 through 16.3.)

14. Pursuant to agreement, the Union is authorized by the trustees of the two Industry Advancement Funds to collect unremitted contributions on their behalf; the Union forwards any contributions collected, and, for its efforts, the Union is rewarded any liquidated damages or attorney's fees it recovers in the process. (Bennett Aff. at ¶ 3.)

15. The AGC and IHC agreements require that signatory employers hire all operating engineers through Local 101's hiring hall, which maintains an out-of-work list on which unemployed individuals may register for employment referral. Indeed, both the AGC and IHC agreements clearly state that "The Union shall be the sole and exclusive source of referrals of applicants for employment." (G. Wyatt Depo. II at Exh. 1, § 4.1(c), and at Exh. 2, Art. V, § 4.)

16. Since on or about January 1, 2001, Defendants have failed to solicit the Union's hiring hall for referral of operating engineers. Indeed, no employment applicant has ever been referred to G & C Excavating by the Union's hiring hall. (Bennett Aff. at ¶ 4.)

17. All reports, contributions, and dues required to be submitted under the IHC agreement are due by the 25th day of the month following the month in which the work was performed. If the reports, contributions, or dues are not submitted in a timely manner, the employer is considered delinquent. (Wilson Aff. at ¶ 6; G. Wyatt Depo. II at Exh. 2, Article XX, ¶ 5.)

18. All reports, contributions, and dues required to be submitted under the AGC agreement are due by the 25th day of the month following the month in which the work was performed. If the reports, contributions, or dues are not submitted in a timely manner, the employer is considered delinquent. (Wilson Aff. at ¶ 7; G. Wyatt Depo. II at Exh. 1, ¶ 17.5.)

19. Where an employer is delinquent in remitting fringe-benefit contributions (other than Industry Advancement Fund contributions) under the AGC agreement, the Funds may add 10% to the amount due as liquidated damages; they may also charge interest, based on the rate as provided in §6621 of the Internal Revenue Code, on any outstanding delinquency balance. Each employer also agrees to pay, in addition to such principal balances, liquidated damages, and interest, a reasonable attorney's fee and costs incurred by the Funds in connection with litigation instituted to recover these amounts. (Wilson Aff. at ¶ 8; G. Wyatt Depo. II at Exh. 1, ¶¶ 17.5-17.6.)

20. Where an employer is delinquent in transmitting supplemental dues or MCI Advancement Fund contributions pursuant to the AGC agreement, the Union may add 10% to the amount due as liquidated damages. Each employer also agrees to pay, in addition to such principal balances and liquidated damages, a reasonable attorney's fee and costs incurred in connection with litigation undertaken to recover these amounts. (Wilson Aff. at ¶ 9; G. Wyatt Depo. II at Exh. 1, ¶¶ 14.5, 14.6, 16.1-16.3, 17.5, and 17.6.)

21. Where an employer is delinquent in remitting fringe-benefit contributions (other than Industry Advancement Fund contributions) under the IHC agreement, the Union may add 10% to the amount due as liquidated damages; it may also charge interest, based on the rate as provided in §6621 of the Internal Revenue Code, on any outstanding delinquency balance. Each employer also agrees to pay, in addition to such principal balances, liquidated damages, interest, a reasonable attorney's fee and costs incurred by the Union in connection with litigation instituted to recover these amounts. (Wilson Aff. at ¶ 10; G. Wyatt Depo. II at Exh. 2, Article XX, ¶¶ 5 and 6.)

22. Where an employer is delinquent in transmitting membership dues or HCA Advancement Fund contributions pursuant to the IHC agreement, the Union may add 10% to the amount due as liquidated damages. Each employer also agrees to pay, in addition to such principal balances and liquidated damages, a reasonable attorney's fee and costs incurred in connection with litigation undertaken to recover these amounts. (Wilson Aff. at ¶ 11; G. Wyatt Depo. II at Exh. 2, Article XVIII, ¶¶ 5-7, Article XIX, and Article XX, ¶¶ 5 and 6)

23. The jurisdiction of the AGC agreement extends to and includes all work performed by operating engineers throughout the entire State of Missouri, except St. Louis City, St. Louis County, Jackson County, Clay County, Platte County, and Ray County, or counties under the jurisdiction of Operating Engineers 513 and Local No. 16. (G. Wyatt Depo. II at Exh. 1, p. 1 and Art. XXIII.)

24. The jurisdiction of the IHC agreement extends to and includes all work performed by operating engineers in the following counties: Leavenworth, Wyandotte, Miami, and Johnson Counties in Kansas, and Jackson, Clay, Platte, Ray Counties in Missouri and that portion of Richard's Gebaur Air Force Base in Cass County, Missouri. (G. Wyatt Depo. II at Exh. 2, p. 1 and XXIV.)

25. From September 2000 through January 2001, operating engineers employed by K.C. Excavating performed work for K.C. Excavating each month in the following counties exclusively: Johnson (KS); Leavenworth (KS); and Jackson (MO). Thus, every hour worked during that time period was performed within the territorial jurisdiction of the IHC agreement. (G. Wyatt Depo. II at Exh. 1, p. 1, Exh. 2, p. 1, and Exhs. 3-7.)

26. K.C. Excavating has failed to remit all contributions due for the months of September 2000 through January 2001. Based on the Employers Contribution Reports submitted by K.C. Excavating, it became indebted to the Funds in the following principal amounts for work performed from September 2000 through January 2001:

a. Pension Fund: $16,446.50;



Case 4:01-cv-00087-SOW Document 36 Filed 12/28/01 Page 15 of 44

b. Health & Welfare Fund: $13,392.18;

c. Apprenticeship Fund: $1,409.70;

d. Vacation Fund: $5,027.95;

e. Membership Dues: $3,900.14;

f. Heavy Contractors Association and Missouri Construction Industry Advancement Funds: $939.80.

Taking into account interim payments made by K.C. Excavating toward these principal amounts, it currently owes no principal. However, because of the lateness of those payments, $3,786.88 in liquidated damages is currently outstanding, all of which arises from work performed for K.C. Excavating through January 31, 2001.

(Wilson Aff. at ¶ 12, and Exh. 1; G. Wyatt Depo. II at Exhs. 3-7.)

27. On September 14, 2000, Garry Wyatt formed G & C Excavating, L.L.C. Garry was named as the company's sole member. (C. Wyatt Depo. at Exh. 76.)

28. G & C Excavating, like K.C. Excavating, is a construction contractor in the business of heavy commercial excavating and grading in the Kansas City metropolitan area. Indeed, all work performed by G & C Excavating since its inception has been performed within the territorial jurisdiction of the IHC agreement. (G. Wyatt Depo. II, at 28:3-29:18, 30:23-31:25, 99:10-99:19, Exh. 1 at p. 1, and Exh. 2 at p. 1; C. Wyatt Depo. at Exh. 77.)

29. On October 23, 2000, G & C Excavating's articles of organization were amended to substitute Christina Wyatt for Garry as sole member. (C. Wyatt Depo. at Exh. 76.)

30. In or around January 2001, K.C. Excavating ceased operating and discharged all its employees. It has not operated since then, however, it has not dissolved or filed for bankruptcy protection. (G. Wyatt Depo. II, at 17:6-17:11, 103:2-103:5.)

31. In or around January 2001, G & C Excavating commenced operations. It was started with only around $20,000 in startup capital. All of that money came out of Christina Wyatt's personal savings. According to the most recent bank account statement produced by Defendants, G & C Excavating had only $28,332.80 in its only bank account as of July 31, 2001. (C. Wyatt Depo., at 9:13-10:11, and at Exh. 75.)

32. G & C Excavating has a line of credit against which it had borrowed $62,000.00 as of July 2001. (Attachment G, Melissa Riley Depo. at Exh. 81.)

33. Of the nine employees on G & C Excavating's payroll in 2001, eight of them had worked for K.C. Excavating when it closed; namely, Christian Ackerman, Scott Moffett, Melissa Riley, Robert Sipple, William Warren, Daniel Woodring, Christina Wyatt, and Garry Wyatt. Ms. Riley no longer works for G & C Excavating, having moved out of the area. (G. Wyatt Depo. II, at 16:24-17:18, 19:3-23:20; C. Wyatt Depo., at 24:10-25:22; Attachment H, K.C. Excavating's Supp. Resp. to Interrogs., at Att. 2; Attachment I, G & C Excavating's Supp. Resp. to Interrogs., at 4,7.)

34. G & C Excavating is not a signatory to any collective bargaining agreements in its proper name. (C. Wyatt Depo., at 60:22-61:3.)

35. For a time in or around late 2000, G & C Excavating operated out of the Wyatts' private residence in Urich, Missouri. (G. Wyatt Depo. II, at 86:14-87:6 and Exh. 56.)

36. From January 2001 through April 2001, G & C Excavating and K.C. Excavating operated out of offices located at 16519 E. Truman Road, Independence, Missouri. The two companies also shared a post office box, namely, P.O. Box 300080, Kansas City, Missouri 64130. (G. Wyatt Depo. II, at 25:1-25:7, and Exhs. 47-52, 69; C. Wyatt Depo., at 12:14-12:22, 32:5-32:12, 39:20-40:10, and Exh. 78)

37. G & C Excavating was permitted by the landlord to use the East Truman offices rent-free. The landlord, K.C. Holdings, Inc., is wholly owned by Garry Wyatt. Early in 2001, K.C. Excavating and G & C Excavating were both operating out of these offices simultaneously. (G. Wyatt Depo. II, at 25:20-26:4, 35:24-36:6, 84:4-84:9; C. Wyatt Depo., at 12:14-13:12.)

38. K.C. Excavating and G & C Excavating share the same computer system, bookkeeping software, payroll software, and filing systems. (G. Wyatt Depo. II, at 74:2-74:10; C. Wyatt Depo., at 25:13-26:12; Attachment G, Melissa Riley Depo., at 14:11-14:22.)

39. G & C Excavating acquired all of its office equipment, furniture, and supplies from K.C. Excavating. There is no record of any such transaction, and Christina Wyatt and Garry Wyatt claim they do not recall any of the particulars of such transactions. (G. Wyatt Depo. II, at 75:8-75:19; C. Wyatt Depo., at 13:13-14:2.)

40. Every piece of equipment and every vehicle owned by K.C. Excavating has been pressed into service by G & C Excavating. G & C Excavating owns no equipment or vehicles in its own name, save for two very minor exceptions--an old scraper and uniloader. G & C Excavating has not purchased or leased any equipment or vehicles, other than these two minor exceptions, from any person other than K.C. Excavating & Grading. (G. Wyatt Depo. II, 39:20-39:23 and at Exh. 8; C. Wyatt Depo., at 67:22-68:18.)

41. Defendants have an equipment lease agreement covering all equipment and vehicles leased from K.C. Excavating by G & C Excavating, other than a Komatsu track hoe and a Ford F-150 truck. The track hoe is rented by G & C Excavating despite the absence of any written agreement; the truck is rented by G & C Excavating at no cost. The equipment lease agreement may have been prepared and signed after the Defendants began their lease arrangement. Under the lease agreement, G & C Excavating must remit $18,065.00 each month directly to the secured creditor, Financial Federal Credit, Inc., precisely the monthly payment due each month to the creditor by K.C. Excavating. However, the lease agreement includes certain items that are not financed through Financial Federal. (G. Wyatt Depo. II, at 36:11-37:20, 43:10-44:1, 62:1-63:11, 104:15-106:21, 111:23-113:16 and at Exh. 8; Riley Depo., at 41:7-43:11.)

42. At least one of the items listed in the Defendants' equipment lease agreement is not owned by K.C. Excavating; rather, it is owned by K.C. Holdings, another of Garry Wyatt's companies. (G. Wyatt Depo. II, at 105:9-105:20.)

43. Some of the vehicles owned by K.C. Excavating and leased by G & C Excavating are currently parked at the Wyatts' personal farm in Urich, Missouri. (G. Wyatt Depo. II, at 45:13-46:20, 113:2-113:12.)

44. One of the vehicles previously owned by K.C. Excavating, a 1998 Dodge pickup truck, was traded in to a car dealership for a newer model. The new truck is titled in Garry Wyatt's name. (G. Wyatt Depo. II, at 45:10-47:8.)

45. Financial Federal was never formally notified in writing about the Defendants' lease arrangement. Nor has Financial Federal formally consented to the arrangement. (G. Wyatt Depo. II, at 106:8-106:21.)

46. Christina Wyatt made the decision to lease all of K.C. Excavating's equipment at the agreed-upon price despite the following: (1) she has no experience in appraising heavy equipment or vehicles; (2) she did not independently confirm the value of the equipment she was leasing; and (3) she failed to solicit prices on equipment or vehicles from any persons other than K.C. Excavating. (C. Wyatt Depo., at 64:21-68:5.)

47. G & C Excavating continues to operate K.C. Excavating's equipment and vehicles. To this day, a number of these retain the "K.C. EXCAVATING & GRADING" logo emblazoned on their doors or side panels. (G. Wyatt Depo. II, at 48:9-48:13, 113:17-114:8; Bennett Aff. at ¶ 5.)

48. Between January and April 2001, inclusive, there were twenty unexplained funds transfers from G & C Excavating to K.C. Excavating, totalling $48,140.00, as reported in G & C Excavating's internal records. In April and May, 2001, G & C Excavating

deposited the sum of $2,450.00, representing the proceeds from a sale of K.C. Excavating assets, as reported in G & C Excavating's internal records. The Wyatts claim they do not recall any details of these transactions. (G. Wyatt Depo. II, at 73:2-75:23 and Exhs. 41, 42; C. Wyatt Depo., at 32:21-35:3 and Exhs. 41, 42.)

49. In addition to the transfers cited in the next preceding paragraph, bank records indicate there was an unexplained transfer of $57,328.38 from K.C. Excavating to G & C Excavating on March 12, 2001. And on July 16, 2001, an additional unexplained transfer of $25,000.00 was made by K.C. Excavating to G & C Excavating. (G. Wyatt Depo. II at Exh. 75, Stmt. Dates 7/31/01 and 3/29/01; Attachment J, Creighton Bank Acct. Stmts., Stmt. Dates 7/31/01 and 3/29/01).

50. The instant lawsuit was initially brought, in January 2001, as a garden-variety ERISA collection case against K.C. Excavating alone. This was months before G & C Excavating was joined as a Defendant. The undersigned attorney first became aware of potential alter-ego activity in or around March 2001. In April 2001, the undersigned attorney notified opposing counsel for the first time, by telephone, there were rumors that K.C. Excavating may be involved in alter-ego activity. During that conversation, the undersigned also advised opposing counsel he was interested in deposing Garry Wyatt regarding the alleged activity. (See Complaint; Attachment L, Walter Aff., at ¶ 3.)

51. Shortly after the undersigned notified opposing counsel he had reason to believe K.C. Excavating might be involved in alter-ego activity, G & C Excavating abruptly ceased making funds transfers to K.C. Excavating. Also in April 2001, G &

C Excavating changed its address to 6817 Stadium Drive, Kansas City, Missouri 64130. (G. Wyatt Depo. II at Exh. 42; C. Wyatt Depo., at 39:20-40:8.)

52. On May 23, 2001, G & C Excavating paid $47,071.00 to satisfy a judgment entered against K.C. Excavating & Grading for delinquent contributions in Case No. 98-0452 (W.D. Mo.). Judgment had been entered by Judge Sachs on January 19, 2001. (G. Wyatt Depo. II, at 75:24-78:5 and at Exhs. 43-46; Attachment K, Consent Judgment against K.C. Excavating and in favor of Operating Eng'rs L. 101 Funds, Jan. 19, 2001.)

53. Garry Wyatt is employed as G & C Excavating's Project Manager/Field Superintendent; Garry also performs the duties of an operating engineer. He is the only person other than Christina Wyatt who has the power to hire and fire. In fact, Garry has discretion to hire and fire without Christina's permission. All employees report to Garry. Garry directs all field operations. Besides Christina, Garry is the only person with whom G & C Excavating's attorneys meet regarding matters affecting G & C Excavating. Yet Garry earns only $5.75 an hour from G & C Excavating, less than any other employee. He admits he could make much more money at another company. (G. Wyatt Depo. II, at 23:10-24:15, 69:13-69:21, 70:4-70:6, 107:7-107:13; C. Wyatt Depo., at 21:23-21:25, 23:18-23:21, 29:8-29:14, 48:9-48:13, 49:5-49:13, and at Exhs. 38-40.)

54. Christina Wyatt concedes that Garry is part of the control group of G & C Excavating. But Christina Wyatt retains ultimate authority over G & C Excavating's operations. (C. Wyatt Depo., at 48:24-49:18.)

55. According to his 1999 tax returns, the most recent produced by Defendants, Garry Wyatt personally earned $320,082.00 that year on gross revenues of $4,492,930. K.C. Excavating's total assets were valued at $3,026,318.00 at the time. (Riley Depo. at Exh. 82, Form 1120S and Sch. K.)

56. Although Christina Wyatt is the Managing Member, she does not make any major decisions without consulting Garry first. This is primarily because Christina has no prior experience with heavy equipment operation or in running a business of any kind. (C. Wyatt Depo., at 7:25-8:5, 48:24-50:18.)

57. Besides Garry Wyatt, the other operating engineers employed by G & C Excavating are Bruce Johnmeyer, Christian Ackerman and Scott Moffett. (G. Wyatt Depo. II, at 19:3-19:11, 23:7-23:18, 34:18-35:10.)

58. The AGC and IHC collective bargaining agreements cover all work performed by operating engineers on construction projects, as further defined in the agreements. (G. Wyatt Depo. II at Exh. 1, Arts. III and XXIII, and at Exh. 2, Arts. III and XXIV.)

59. G & C Excavating's continuing obligations, in terms of payroll and equipment leasing expenses alone, amount to approximately $32,000.00 a month. (G. Wyatt Depo. II at Exhs. 8, 36.)

60. In 2000, K.C. Excavating & Grading made several unexplained payments totalling $6,705.76 to Christina Wyatt from its bank account. These payments were not part of her salary and no receipts were produced by Defendants to verify whether

they were expense reimbursements. (G. Wyatt Depo. II at Exh. 59; Walter Aff. at ¶ 4).

61. As of September 13, 2001, Christina Wyatt had made payments to herself from G & C Excavating's bank accounts totalling $4,701.52 for the year-to-date. These payments were are not part of her salary and were not paid pursuant to the Distributions and Allocations provisions of G & C Excavating's Operating Agreement, in that no formal membership vote preceded their payment; nor were any receipts produced by Defendants to verify whether these payments were for expense reimbursement. (C. Wyatt Depo., at 31:22-32:4; 35:4-35:24 and at Exh. 47, Art. 4, and at Exh. 58; Walter Aff. at ¶ 5).

62. As of September 13, 2001, G & C Excavating had made several unexplained payments totalling $166.30 to Garry Wyatt from its bank account. These payments were not part of his salary and no receipts were produced to verify whether they were expense reimbursements. (G. Wyatt Depo. II, at 88:20-90:3 and Exh. 58; Plaintiffs' Req. for Prod. to G & C Excavating, at ¶ 61; G & C Excavating's Resp. to Req. for Prod., at 1.)

63. Both Defendants are represented by the same law firm, Beckett & Hensley, L.C. (See Joint Answer.)

64. Garry Wyatt does not recall K.C. Excavating's holding an annual shareholders' meeting in 2000 or 2001. (G. Wyatt Depo. II, at 102:1-102:16.)

65. In 2001, G & C Excavating completed two construction projects that were initially bid on by K.C. Excavating. One was the Shawnee Station Apartments project

in Shawnee, Kansas; the other was the Douglass National Bank project in Kansas City, Kansas. In fact, on occasion, the subcontractor was interchangeably referred to by the contractors as G & C Excavating, LC and K.C. Excavating & Grading, Inc. (or "KC Excavation") (G. Wyatt Depo. II, at 52:3-54:11, and at Exhs. 18-26; C. Wyatt Depo. at Exh. 77.)

66. Garry and Christina Wyatt have purchased personal items such as boat covers using funds out of the G & C Excavating bank account. (G. Wyatt Depo. II, at 87:7-87:18, and at Exh. 56.)

67. From January 1, 2001, through March 31, 2001, the straight-time hourly rate of pay under the Individual Heavy Contractors agreement was $22.24; the overtime rate during the same time period was $33.36. From April 1, 2001, through September 8, 2001, the last date for which payroll numbers were produced, the straight-time hourly rate of pay under the IHC agreement has been $23.04; the overtime rate during the same time period has been $34.56. (Bennett Aff. at ¶ 6 and Exh. 1)

68. From January 1, 2001, through March 31, 2001, Christian Ackerman, Garry Wyatt, Bruce Johnmeyer, and Scott Moffett worked a total of 707 straight-time hours and 7.5 overtime hours for G & C Excavating; between April 1, 2001, and September 8, 2001, these individuals worked a total of 3,307 straight-time hours and 225.5 overtime hours for G & C Excavating. Had those hours been paid at union scale, these individuals would have earned $99,960.44 in the aggregate during that time period. (G. Wyatt Depo. II at Exhs. 38-40; Bennett Aff. at ¶ 7 and Exhs. 2 and 3.)

69. On each and every day from January 1, 2001, through September 8, 2001, there were at least four employment applicants on the out-of-work, or referral, list maintained by Operating Engineers Local Union No. 101's hiring hall. (Bennett Aff. at ¶ 9 and Exh. 5.)

70. No fringe-benefit contributions have been remitted to Plaintiffs on behalf of G & C Excavating's employees based on work performed for G & C Excavating. (Bennett Aff. at ¶ 10.)

71. If fringe-benefit contributions are due and payable to the Plaintiff Funds pursuant to the IHC agreement for work performed by G & C Excavating's operating engineers, then, based on the number of hours worked by those employees from January 1, 2001, through September 8, 2001 (see ¶ 74, above), the following amounts are due and owing: $35,398.53 in unpaid contributions; $3,539.82 in liquidated damages; $1,157.25 in accrued interest, through December 12, 2001. These figures include amounts owed to the Industry Advancement Funds, as further itemized in Paragraph 73, below. (Bennett Aff. at ¶ 8 and Exhs. 3, 4.)

72. Christina Wyatt has only one personal checking account, which is jointly held with her husband, Garry Wyatt. (C. Wyatt Depo., at 27:17-28:2.)

73. Based on covered work performed from January 1, 2001, through September 8, 2001, Defendants owe $961.99 in Industry Advancement Funds, including attendant damages (specifically, $849.30 in unpaid contributions; $84.93 in liquidated damages, and $27.76 in accrued interest, through December 12, 2001.) (Bennett Aff. at ¶ 11.)

## III. STANDARD FOR SUMMARY JUDGMENT

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir.1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also *Get Away Club, Inc. v. Coleman*, 969 F.2d 664 (8th Cir.1992).

## IV. ARGUMENT AND AUTHORITIES

### A. Plaintiff Funds Are Entitled To Summary Judgment On Their Claim For Recovery Of Delinquent Fringe-Benefit Contributions Against Defendants K.C. Excavating & Grading, Inc. And G & C Excavating, L.L.C.

Plaintiff Funds assert a claim for relief under § 515 of the Employee Retirement Income Security Act of 1974, as amended, based on Defendants' failure and refusal to remit contractually-mandated fringe-benefit contributions for covered hours worked by Defendants' operating engineers. Section 515 of ERISA provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Employers who fail to meet the § 515 obligation are liable for contributions, court costs, attorney's fees, plus liquidated damages and interest as prescribed under the terms of the plan or a collectively bargained agreement. 29 U.S.C. § 1132(g)(2).

Plaintiffs' statement of uncontroverted facts demonstrates that K.C. Excavating is bound to the current AGC and IHC collective bargaining agreements with the Union. Judge Howard Sachs so held in his February 24, 2000, decision granting in part Plaintiffs' motion for summary judgment against K.C. Excavating & Grading, Inc. for unpaid contributions and dues in Case No. 98-0452. (Unc. Facts ¶ 10.) Defendants are now collaterally estopped from relitigating that issue. *See Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir. 1983).

The facts further demonstrate that G & C Excavating has employed operating engineers since January 2001; G & C currently employs four operating engineers, namely, Garry Wyatt, Scott Moffett, Christian Ackerman, and Bruce Johnmeyer. (Unc. Facts ¶ 57.) Work performed by the operating engineer classification is expressly covered by both the AGC and IHC collective bargaining agreements. (Unc. Facts ¶ 4, 23, 24.) All work performed by G & C Excavating since its inception in January 2001 has taken place within the territorial jurisdiction of the IHC agreement. (Unc. Facts ¶ 28.) However, no fringe-benefit contributions have been remitted on their behalf to the Plaintiffs for any work performed for G & C Excavating. (Unc. Facts ¶ 70.)

The failure to remit fringe-benefit contributions is a violation of ERISA and the terms of the relevant collective bargaining agreements when committed by a signatory contractor. 29 U.S.C. §§ 1132 and 1145; (Unc. Facts ¶¶ 17-22.) G & C Excavating is not a signatory to any collective bargaining agreement in its proper name. (Unc. Facts ¶ 34.) Plaintiffs allege, however, that G & C Excavating is bound to the AGC and IHC agreements and that Defendants are jointly and severally liable for the unpaid contributions and union wages, inasmuch as G & C Excavating and K.C. Excavating are alter egos. *Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d 926, 930 (8th Cir. 1984) (imposing joint and several liability upon an individual for his corporation's indebtedness to a union pension fund based on extensive evidence that a newly formed corporation

was in fact the individual's alter ego). *See also, Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307 (1st Cir. 1998) ("A finding that two employers are alter egos will bind the nonsignatory to a collective bargaining agreement between the union and the nonsignatory's alter ego.").

Under the alter ego doctrine, the legal fiction of the separate business entity may be ignored in the case of a business that (1) is controlled by another to the extent that it has independent existence in form only, and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetrate a fraud.[2] *Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997). "The essence of the [alter ego] test is whether, under all the circumstances, the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." *Superior General Contractors, Inc.*, 104 F.3d at 1055, *quoting Pepper v. Litton*, 308 U.S. 295, 306-07, 60 S.Ct. 238, 245-46, 84 L.Ed. 281 (1939).

In general, alter egos are found where two enterprises share "substantially identical management, business purpose, operation, equipment, customers, and supervision as well as ownership." *Caplin v. Medine's Expo Serv., Inc.*, 1996 WL 51214, at * 4 (N.D. Ill. 1996). In determining whether an alter-ego relationship exists, courts usually require the plaintiff to produce evidence of one or more of the following factors: (1) whether a corporation is operated as a separate entity; (2) commingling of funds and other assets; (3) failure to maintain adequate corporate records or minutes; (4) common ownership or control; (5) absence of corporate assets and undercapitalization;

[2]Before the advent of the limited liability company and other hybrid business organizations, the alter-ego doctrine applied exclusively to corporations. Most commentators accept, however, that the doctrine applies with equal force to limited liability companies, like G & C Excavating, thereby allowing the Court to treat them like corporations for the purpose of piercing the veil. Eric Fox, *Piercing the Veil of Limited Liability Companies*, 62 Geo. Wash. L. Rev. 1143, 1167-68 (1994); *see also, Hollowell v. Orleans Regional Hosp., LLC*, 217 F.3d 379 (5th Cir. 2000).

(6) use of a corporation as a mere shell; (7) disregard of legal formalities and the failure to maintain an arm's-length relationship among related entities; and (8) diversion of the corporation's funds or assets to noncorporate uses. *United States v. Van Diviner*, 822 F.2d 960, 965 (10th Cir. 1987). *See also,* Mark A. Olthoff, *Beyond the Form--Should the Corporate Veil be Pierced?*, 64 UMKC L. Rev. 311, 313 (Winter 1995); *Collet v. American Nat.* Stores, 708 S.W.2d 273, 284 (Mo. App. 1986) (applying Missouri state law).[3] "However, none of these factors is a prerequisite to a finding that the corporate form has been violated." *Laborers' Pen. Trust Fund v. Weinberger Homes*, 872 F.2d 702, 705 (6th Cir. 1988). As demonstrated below, all eight *Van Diviner* factors are satisfied in this case.

**1. Common Control**

The facts here present a textbook case of an alter-ego relationship, beginning with common control and management. The issue of common control is of critical importance to establishing alter-ego liability. See *Superior General Contractors, Inc.*, 205 F.3d at 1055. However, common *ownership* is not required to find an alter-ego relationship. *Trustees of Pension, Welfare, and Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785, 789 (7th Cir. 1993).

First and foremost, the control and management of the two Defendants is nearly identical. And, in fact, from September 14 to October 23, 2000, Garry Wyatt was the sole owner of both companies.

---

[3] Generally speaking, federal substantive law governs the resolution of a plaintiff's claims arising under ERISA. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987). In order to interpret the applicable principles of federal law, however, state law, if compatible with the purpose of ERISA, may be resorted to in order to find the rule that will best effectuate the federal policy. *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 457 (1957). Since Eighth-Circuit law is rather thin when it comes to articulating a definitive alter-ego standard, it is appropriate to consult compatible state laws for assistance in defining the contours of such a standard, including its component factors.

(Unc. Facts ¶¶ 27-29.) The Defendants' attorney, Ted Beckett, evidently recognized the potential for alter-ego liability. So, on October 23, 2000, in a move apparently designed to avoid raising the suspicion of K.C. Excavating's creditors, amended G & C Excavating's articles of organization to remove Garry as its sole member, and to install Christina Wyatt in his place. (*See* Unc. Facts. ¶ 29.)

Yet Christina Wyatt's installation as sole member of G & C Excavating should not obscure the fact that the control group for both Defendants has not changed; both companies are jointly controlled and managed by Garry and Christina Wyatt. (Unc. Facts ¶ 6.) K.C. Excavating has but one shareholder, Garry Wyatt, and two officers, Garry and Christina Wyatt. (Unc. Facts ¶¶ 29, 53, 56.) G & C Excavating has one member, Christina Wyatt, and two managers, Garry and Christina Wyatt. Defendants may allege that, aside from being sole shareholder and president, Garry also called all the shots at K.C. Excavating. Defendants may also dispute that Christina exercised any actual authority at K.C. Excavating.[4] But such arguments would be misplaced. Christina's status as corporate secretary of K.C. Excavating cannot be ignored. "[C]ertain individuals within any corporation are deemed to have inherent or intrinsic authority regardless of their ostensible duties," including officers, who, together with shareholders, enjoy "ultimate control" over a corporation's affairs. *Cooper v. United States*, 827 F.Supp. 1309, 1313 (E.D. Mich. 1993). As one of only two officers of K.C. Excavating, Christina is vested with broad inherent authority to act on its behalf, "*whether [s]he exercises that authority or not.*" 827 F.Supp. at 1313 (emphasis in original), *quoting Thomsen v. United States*, 887 F.2d 12 (1st Cir. 1989). Furthermore, Garry and Christina share authority to sign checks on behalf of K.C. Excavating, and both have exercised that authority on numerous occasions.

---

[4]Christina Wyatt alleges, for example, that she was unaware of the specific duties delegated to her in her capacity as corporate secretary. (C. Wyatt Depo., at 52:15-52:17.)

(Unc. Facts ¶ 7.) Thus, both Garry and Christina are clearly members of the control group that ran K.C. Excavating.

The situation at G & C Excavating is not demonstrably different. As its sole member--and a managing member, at that--with avowed ultimate authority over all of G & C Excavating's operations, Christina is unquestionably part of G & C Excavating's control group. (*See* Unc. Facts ¶¶ 29, 54, 56.) The evidence shows that Garry is also an integral component of that control group. For example, Christina does not make any major decisions at G & C Excavating without first consulting Garry--indicating that Garry has retained a large measure of control over the new company. (*See* Unc. Facts ¶ 56.) Christina even testified that she considers Garry a member of the control group. (Unc. Facts ¶ 54.) As project manager and field supervisor, Garry wields considerable authority. As he did at K.C. Excavating, Garry assumes responsibility for labor relations at G & C Excavating, where the employees report to him and he has unlimited discretion to hire and fire. (Unc. Facts ¶ 53.) It is ironic, then, that Garry Wyatt is the lowest-paid employee of G & C Excavating, at $5.75 an hour--a steep decline from his personal earnings of over $320,000.00 in 1999. (Unc. Facts ¶¶ 53, 55.) It hardly requires a leap of faith for one to infer from this that Mr. Wyatt is sharing with his wife in G & C Excavating's profits. When payable, these would presumably be deposited into her only personal bank account, which happens to be a jointly held with Garry. (*See* Unc. Facts ¶ 72.) That Garry reaps financial benefits from his wife's ownership of G & C Excavating is further evidence of common control. *General Longshore Workers, Local 1988 v. Pate Stevedore Co.*, 1993 WL 603297 (N.D. Fla. 1993).

**2. Failure to Maintain Separate Legal Identities**

After common control, the next most critical element necessary to establish alter-ego liability is the failure of the companies to maintain separate legal identities and fail to negotiate with one

another at arm's length. *Superior General Contractors, Inc.*, 104 F.3d at 1055. In analyzing the evidence in light of the arm's-length-bargaining factor, the fact that Garry and Christina Wyatt are a married couple should not be lost on the court. Courts have long noted that close family ties between the insiders to affiliated but ostensibly separate companies are inherently suspect and a cause for heightened scrutiny of the companies' interrelations. *Horton Dairy, Inc. v. United States*, 986 F.2d 286, 289 (8th Cir. 1993); *Ragan v. Tri-County Excavating, Inc.* 62 F.3d 501 (3rd Cir. 1995).

The evidentiary record is replete with instances demonstrating that the Defendants failed to maintain separate legal identities and failed to bargain at arm's length. Indeed, Defendants are essentially one and the same entity. The most obvious similarity between the two Defendants is the nature of the work they perform. G & C Excavating, like K.C. Excavating, is a construction contractor in the business of heavy commercial excavating and grading in the Kansas City metropolitan area. (Unc. Facts ¶¶ 5, 28.) G & C Excavating began operating in January 2001, the very month K.C. Excavating ceased doing business. (Unc. Facts ¶¶ 30, 31.) G & C Excavating even managed to pick up a couple of projects originally bid by K.C. Excavating, namely, Douglass National Bank in Kansas City, Kansas, and the Shawnee Station Apartments in Shawnee, Kansas--a $500,000.00 project. (Unc. Facts ¶ 65.)

The transition from K.C. Excavating to G & C Excavating was very smooth. G & C Excavating hardly missed a beat, picking up right where K.C. Excavating left off. Of the nine employees on G & C Excavating's payroll throughout much of 2001, eight of them had worked for K.C. Excavating when it closed; namely, Christian Ackerman, Scott Moffett, Melissa Riley, Robert Sipple, William Warren, Daniel Woodring, Christina Wyatt, and Garry Wyatt. (Unc. Facts ¶ 33.)

Late in 2000, after G & C Excavating was formed but before it commenced substantive operations, it operated out of the Wyatts' private residence in Urich, Missouri. (Unc. Facts ¶ 35.)

Then, from January 2001 through April 2001, G & C Excavating and K.C. Excavating operated simultaneously out of offices located at 16519 East Truman Road, Independence, Missouri. (Unc. Facts ¶¶ 36, 37.) The two companies also shared a post office box, namely, P.O. Box 300080, Kansas City, Missouri 64130. (Unc. Facts ¶ 36.) Sharing common office space and addresses is a sign of an alter-ego relationship. E.g., *Wausau Business Ins. Co. v. Turner Const. Co.*, 141 F.Supp.2d 412, 418 (S.D.N.Y. 2001). In one of many instances manifesting a lack of arm's-length bargaining, G & C Excavating was permitted to use the East Truman offices rent-free by the landlord, K.C. Holdings, Inc. (Unc. Facts ¶ 37.) Not surprisingly, K.C. Holdings is wholly owned by Garry Wyatt. (Id.)

Since G & C Excavating's inception, K.C. Excavating and G & C Excavating have shared the same computer system, bookkeeping software, payroll software, and filing systems. (Unc. Facts ¶ 38.) G & C Excavating acquired all of its office equipment, furniture, and supplies from K.C. Excavating. (Unc. Facts ¶ 39.) There is no record memorializing these acquisitions, and neither Christina Wyatt nor Garry Wyatt recalls any of the particulars thereof, or so they claim; presumably, G & C Excavating acquired all of this property for free. (*See* id.) In any event, the laxity surrounding these transactions as well as the failure to maintain corporate records regarding them should serve as further evidence that the Wyatts fail to appreciate a distinction between the Defendants' respective assets.

Every piece of equipment and every vehicle owned by K.C. Excavating has been pressed into service by G & C Excavating. (Unc. Facts ¶ 40.) G & C Excavating owns no equipment or vehicles in its own name, save for two very minor exceptions--an old scraper and uniloader. (Id.) G & C Excavating has not purchased or leased any equipment or vehicles (other than these two minor exceptions) from any person other than K.C. Excavating & Grading. (Id.) Some of the vehicles owned by K.C. Excavating and leased by G & C Excavating are currently parked at the Wyatts' personal farm, indicating that corporate assets are being diverted to noncorporate uses. (*See* id.)

Defendants have an equipment lease agreement covering all equipment and vehicles leased from K.C. Excavating by G & C Excavating, other than a Komatsu track hoe and a Ford F-150 truck. (Unc. Facts ¶ 41.) The track hoe is rented by G & C Excavating despite the absence of any written agreement; the truck is rented by G & C Excavating at no cost. (Id.) Garry Wyatt admits that the equipment lease agreement may have been prepared and signed after the Defendants began their lease arrangement, suggesting there was a time period during which Defendants' lease arrangement was unwritten and informal. (*See* id.) The informality of these arrangements provide further evidence of a lack of respect paid to the separateness of the two Defendants, and, further, show that Defendants have not negotiated at arm's length.

Under the lease agreement, G & C Excavating must remit $18,065.00 each month directly to the secured creditor, Financial Federal Credit, Inc., precisely the monthly payment due each month to the creditor by K.C. Excavating. (Id.) However, the lease agreement includes certain items that are not financed through Financial Federal, meaning that G & C Excavating gets these items free of charge. (Id.) Financial Federal was never formally notified in writing about the Defendants' lease arrangement. (Unc. Facts ¶ 45.) Nor has Financial Federal formally consented to the arrangement. (Id.) Moreover, at least one of the items listed in the Defendants' equipment lease agreement is not owned by K.C. Excavating; rather, it is owned by K.C. Holdings, another of Garry Wyatt's companies. (Unc. Facts ¶ 42.) And, in yet another move exhibiting a startling indifference for commercially reasonable practices, Christina Wyatt made the decision to lease all of K.C. Excavating's equipment at the agreed-upon price despite the following: (1) she has no experience in appraising heavy equipment or vehicles; (2) she did not independently confirm the value of the equipment she was leasing; and (3) she failed to solicit prices on equipment or vehicles from any persons other than K.C. Excavating. (Unc. Facts ¶ 46.) Once again, these facts exhibit the Wyatts' complete disregard for

Defendants' ostensibly separate legal status, making the two companies virtually indistinguishable. Plainly, Defendants do not bargain at arm's length.

G & C Excavating continues to operate K.C. Excavating's equipment and vehicles. (Unc. Facts ¶ 47.) Despite G & C Excavating's exclusive use of the equipment and vehicles, a number of these retain to this day the "K.C. EXCAVATING & GRADING" logo emblazoned on their side doors. (Id.) Clearly, the Wyatts are abusing the organizational provisions under which G & C Excavating was formed, as they are holding that company out as the defunct K.C. Excavating. The Wyatts simply do not observe any cleavage between the two entities.

There has been extensive intermingling of funds and assets not only between the two Defendants themselves, but also between the Defendants and the Wyatts. "[C]ommingling of funds is a telltale sign of alter-ego liability." *Boards of Trustees of the Bricklayers Local 74 Fringe Benefit Funds v. Michael J. Vorkapic, Inc.*, 2001 WL 649501, at *5 (N.D.Ill. 2001). For instance, one of the vehicles previously owned by K.C. Excavating, a 1998 Dodge pickup truck, was traded in to a car dealership by Garry Wyatt for a newer model. (Unc. Facts ¶ 44.) The new truck is titled in Garry Wyatt's name. (Id.) In addition, Garry and Christina Wyatt have purchased personal items such as boat covers using funds out of the G & C Excavating bank account. (Unc. Facts ¶ 66.) Treating company assets as one's personal funds can be cause for piercing the limited-liability veil. *E.g.*, *United States v. Van Diviner*, 822 F.2d at 965; *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044, 1048 (4th Cir. 1988).

Even more troubling than these transactions, however, are the many mysterious, unexplained funds transfers among the Defendants and the Wyatts, which transfers represent thousands of dollars. The failure of a company to adequately explain suspicious funds transfers between itself and an affiliated business is probative of an alter-ego relationship. *Establissement Tomis v. Shearson*

*Hayden Stone, Inc.*, 459 F.Supp. 1355, 1365-1366 (S.D.N.Y. 1978). Between January and April 2001 alone, there were twenty unexplained funds transfers from G & C Excavating to K.C. Excavating, totalling $48,140.00, as reported in G & C Excavating's internal records. (Unc. Facts ¶ 48.) In April and May, 2001, G & C Excavating deposited the sum of $2,450.00, representing the proceeds from a sale of K.C. Excavating assets, as reported in G & C Excavating's internal records. (Id.) The Wyatts claim they do not recall any details of these transactions. (Id.) In addition, there was an unexplained transfer of $57,328.38 from K.C. Excavating to G & C Excavating on March 12, 2001. (Unc. Facts ¶ 49.) And on July 16, 2001, an additional unexplained transfer of $25,000.00 was made by K.C. Excavating to G & C Excavating. (Id.)

The instant lawsuit was initially brought, in January 2001, as a garden-variety ERISA collection case. (Unc. Facts ¶ 50.) The undersigned attorney first became aware of potential alter-ego activity in or around March 2001. (Id..) At that time, the activity was merely a rumor, conveyed to the undersigned attorney by his clients. (Id..) In April 2001, the undersigned attorney notified opposing counsel, by telephone, for the first time that he had reason to believe that K.C. Excavating may be involved in alter-ego activity. (Id.) During that conversation, the undersigned also advised opposing counsel he was interested in deposing Garry Wyatt regarding the alleged activity. (Id.)

Shortly after the undersigned notified opposing counsel he had reason to believe K.C. Excavating might be involved in alter-ego activity, G & C Excavating abruptly ceased making funds transfers to K.C. Excavating. (Unc. Facts ¶ 51.) Also in April 2001, G & C Excavating changed its address to 6817 Stadium Drive, Kansas City, Missouri 64130.[5] (Id.) However, on May 23, 2001,

---

[5]Defendants may argue that their recent attempts to make G & C Excavating more autonomous should nullify any alter-ego relationship that could otherwise be found. But this would be a misguided argument. Evidence that a new business has "become increasingly independent and diversified since its founding" is not sufficient to negate an alter-ego relationship where the court finds an intent to avoid union obligations and an interrelation of operations." *See, e.g., Central States, Southeast and*

Defendants were up to their old tricks again, in that G & C Excavating paid $47,071.00 to satisfy a judgment entered against K.C. Excavating for delinquent contributions in Case No. 98-0452 (W.D. Mo.). (Unc. Facts ¶ 52.)

In 2000, K.C. Excavating & Grading made several suspicious, unexplained payments totalling $6,705.76 to Christina Wyatt from its bank account. (Unc. Facts ¶ 60.) These payments were not part of her salary and no receipts were produced to verify whether they were expense reimbursements. (Id.) The failure of a company to satisfactorily verify an alleged business expense can be probative of an alter-ego relationship between the company and the party allegedly reimbursed. *Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F.Supp. at 1365-1366. As of September 13, 2001, Christina Wyatt had made payments to herself from G & C Excavating's bank accounts totalling $4,701.52 for the year-to-date. (Unc. Facts ¶ 61.) These payments were are not part of her salary and were not paid pursuant to the Distributions and Allocations provisions of G & C Excavating's Operating Agreement, in that no formal membership vote preceded their payment; nor were any receipts produced to verify whether these payments were for expense reimbursement. (Id.) This shows the disregard for LLC formalities. Also as of September 13, 2001, G & C Excavating had made several unexplained payments totalling $166.30 to Garry Wyatt from its bank account. (Unc. Facts ¶ 62.) These payments were not part of his salary and no receipts were produced to verify whether they were expense reimbursements. (Id.)

A few other items are worth of note. Garry Wyatt is employed as G & C Excavating's Project Manager/Field Superintendent; Garry also performs the duties of an operating engineer. (Unc. Facts ¶ 53.) He wields considerable power. For example, he is the only person other than Christina Wyatt

---

*Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 598 (7th Cir. 1990). The evidence presented herein demonstrates such avoidance of union obligations and interrelation of operations.

who has labor relations authority. (Id.) In fact, Garry has unlimited discretion to hire and fire. (Id.) All employees report to Garry. (Id.) Garry directs all field operations. (Id.) Besides Christina, Garry is the only person with whom G & C Excavating's attorneys meet regarding matters affecting G & C Excavating. (Id.) Yet Garry earns only $5.75 an hour from G & C Excavating, less than any other employee. (Id.) Garry admits that he could earn much more money elsewhere. (Id.) And according to his 1999 tax returns, the most recent produced by Defendants, Garry personally earned over $320,000.00 at K.C. Excavating. (Id.) The most reasonable inference to draw from this set of facts is that the Wyatts and G & C Excavating are not bargaining at arm's length. (Id.) Finally, Garry Wyatt testified that he does not recall K.C. Excavating's holding an annual shareholders' meeting in either 2000 or 2001, illustrating the company's failure to observe corporate formalities. (*See* Unc. Facts ¶ 64.)

**3. Fraudulent Intent**

The third and final factor identified by the Eighth Circuit as critical in evaluating allegations of alter-ego liability is the extent to which the business is "used as a subertfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." *Greater Kansas City Laborers Pension Fund v. Superior General Contractors* 104 F.3d at 1055. The evidence demonstrates that G & C Excavating's very existence represents a travesty perpetrated against Plaintiffs. G & C Excavating was started to avoid K.C. Excavating's financial obligations to the Plaintiffs and, presumably, other creditors as well. Garry Wyatt's testimony that K.C. Excavating was closed because he could not make ends meet, *see G. Wyatt Depo. II, at 50:12-51:4*, is patently false. In 1999, the latest year for which Defendants produced tax returns, Garry Wyatt personally earned $320,082.00 that year on K.C. Excavating's gross revenues of $4,492,930.00. (Unc. Facts ¶ 55.) K.C. Excavating's total assets were valued at $3,026,318.00 at the time. (Id.)

The truth of the matter is, Garry Wyatt had become tired of paying a significant portion of K.C. Excavating's revenues to satisfy his obligations to the Union and the Funds. Garry Wyatt initially tried to avoid paying union scale and fringe-benefit contributions simply by claiming that K.C. Excavating was not bound to the Union contracts. (Unc. Facts ¶ 9.) A few short months after Judge Sachs held that K.C. Excavating was indeed bound to the AGC and IHC agreements, Garry Wyatt formed G & C Excavating, then later installed his wife as sole member. (Unc. Facts ¶¶ 10, 27, 29.) In diverting all work from K.C. Excavating to G & C Excavating for the purpose of avoiding K.C. Excavating's obligations to the Plaintiffs, the Wyatts are clearly operating G & C Excavating for fraudulent and improper purposes. *See Boards of Trustees of the Bricklayers Local 74 Fringe Benefit Funds v. Michael J. Vorkapic, Inc.*, 2001 WL 649501, at *5 (court inferred that transfer of operations from one defendant to the other was motivated by an intent to avoid fringe benefit obligations where transferor was not entitled to terminate its collective bargaining agreement until May 2004, transferor had been previously sued for delinquent contributions, and transferor's representative made clear its reluctance to cooperate with the union).

Coupled with the Wyatts' attempt to avoid future debts is their failure to adequately capitalize G & C Excavating. It was started with only around $20,000 in startup capital. (Unc. Facts ¶ 31.) Again, G & C Excavating owns virtually no equipment, vehicles, furniture, supplies, or real property; Moreover, it has only about $28,000 in its bank account; and it owes $62,000 to bank on its line of credit. (Id.) Taken together, these facts indicate G & C Excavating has a negative net worth around $34,000 (i.e., $28,000 in assets less $62,000 in debt). Negative net worth generally equates to inadequate capitalization. *See, e.g., United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 1997 WL 756602, at *6 (D.Kan. 1997); *Blood v. Pan American World Airways, Inc.*, 1991 WL 251643, at *19 (N.D.Cal. 1991). Moreover, G & C Excavating's continuing obligations, just in terms of payroll and

equipment leasing expenses, amount to approximately $32,000.00 a month, suggesting the company's meager assets provide scant operating capital and, thus, a very slim buffer against an operating loss. These facts--demonstrating that G & C has had a negative net worth since nearly day one--may be used to support a finding of fraud or injustice in an alter-ego action. *See Radaszewski by Radaszewski v. Telecom Corp.*, 981 F.2d 305, 308 (8th Cir. 1992), *cert. denied*, 113 S.Ct. 2338 (1993).) There the Eighth Circuit explained that the Missouri appellate courts have long found an improper purpose in the context of an alter-ego analysis whenever a business is undercapitalized.[6]

Thus, there are two bases upon which the court may find that G & C Excavating is being operated for an improper purpose: (1) the Wyatts diverted work to G & C Excavating and away from K.C. Excavating to avoid K.C. Excavating's obligations to the Plaintiffs; and (2) G & C Excavating has been undercapitalized since day one.

**4. Conclusion**

In light of the foregoing evidence, it is clear that Defendants are legally one and the same entity. Hence, they are jointly and severally liable to the Plaintiffs under ERISA for their failure and refusal to remit fringe-benefit contributions based on the number of contractually-covered hours worked by G & C Excavating's employees since its inception January 1, 2001. Based on the number of covered hours worked through August 31, 2001, Defendants currently owe the following amounts to the Funds: $35,398.53 in unpaid contributions; $3,539.82 in liquidated damages; $1,157.25 in accrued interest, through December 12, 2001. (Unc. Facts ¶¶ 1-3, 12-14, 17-25, 67, 68, 70, 71.) In addition, Defendants owe $3,786.88 in liquidated damages based on work performed for K.C.

[6]Given the dearth of relevant federal law on this topic, application of Missouri state law may be appropriate. *See* note 2, *supra*.

Excavating from September 2000 through January 2001. (Unc. Facts ¶ 26.) These figures include amounts owed to the Industry Advancement Funds, as further itemized in Section IV.B., below.

### B. Plaintiff Union Is Entitled To Summary Judgment On Its Claim For Recovery of Unpaid Union Wages And Industry Advancement Funds Against Defendants K.C. Excavating & Grading, Inc. And G & C Excavating, L.L.C.

In addition to the Funds' claims against Defendants, as set forth above, Plaintiff Union asserts a claim for relief on behalf of its membership under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Section 301(a) authorizes federal lawsuits by signatory unions to enforce the terms of their collective bargaining agreements. *Kansas City Southern Transport Co., Inc. v. Teamsters Local Union #41*, 126 F.3d 1059, 1063 (8th Cir. 1997); 29 U.S.C. § 185(a).

Defendants violated the hiring-hall referral provisions of the IHC and AGC collective bargaining agreements, in that G & C Excavating has failed and refused, and continues to fail and refuse, to honor the hiring-hall referral provisions therein. Specifically, Defendants breached the referral provisions of the collective bargaining agreements by failing and refusing to engage the services of the Union's hiring hall to staff G & C Excavating's construction projects, all of which were performed within the geographical jurisdiction of the agreements. (Unc. Facts ¶¶ 15, 16, 28.) Both the AGC and IHC agreements clearly state that "The Union shall be the sole and exclusive source of referrals of applicants for employment." (Unc. Facts ¶ 15.) In contravention of the collective bargaining agreements, G & C Excavating bypassed the Union entirely to hire its operating engineers, i.e., Garry Wyatt, Scott Moffett, Christian Ackerman, and Bruce Johnmeyer. In other words, none of these individuals was referred to G & C Excavating by the Union. (Unc. Facts ¶ 16.)

Pursuant to § 301 of the Labor Management Relations Act, the Union, as exclusive bargaining representative of Defendants' bargaining-unit employees, is entitled to recover unpaid wages on behalf of the applicants who were properly on the out-of-work list at the time the covered work was

performed. *See Rock Drilling Local Union No. 17 v. Mason & Hanger Co.*, 217 F.2d 687 (2d Cir. 1954) (explaining that LMRA §301 limits the scope of a union's authority to sue on behalf of its members to enforcing the terms of a collective bargaining agreement), *cert. denied*, 349 U.S. 915 (1955); 29 U.S.C. §185(a); *Bufco Corp. v. NLRB*, 147 F.3d 964, 968 (D.C. Cir. 1998) (finding a violation of the collective bargaining agreement and awarding back pay to would-be employees where employer repudiated agreement and circumvented hiring hall); (*see* Unc. Facts ¶ 4.). Those applicants were wrongfully deprived by G & C Excavating of their contractual right to be referred to G & C Excavating for employment. (*See* Unc. Facts ¶ 69.) Based on the total number of covered hours worked, through August 31, 2001, Defendants owe a total of $99,960.44 in unpaid wages to the individuals on the list. (*See* Unc. Facts ¶ 68.)

As a signatory to the collective bargaining agreements, the Union may also sue to enforce the provisions calling for remittance of the HCA and MCI Industry Advancement Fund contributions. (Unc. Facts ¶ 14); *see also, Cement and Concrete Workers Dist. Council Welfare Fund v. Lollo*, 35 F.3d 29, 34 (2nd Cir. 1994) (a signatory union is always a real party in interest to a § 301 suit for unpaid dues and contributions). The Union is authorized by the trustees of the two Industry Advancement Funds to collect unremitted contributions on their behalf; the Union forwards any contributions collected, and, for its efforts, the Union is rewarded any liquidated damages or attorney's fees it recovers in the process. (Unc. Facts ¶ 14.) Based on covered work performed from January 1, 2001, through September 8, 2001, Defendants owe $961.99 in Industry Advancement Funds, including attendant damages (specifically, $849.30 in unpaid contributions; $84.93 in liquidated damages, and $27.76 in accrued interest, through December 12, 2001.) (Unc. Facts ¶ 73.)

Because G & C Excavating and K.C. Excavating are alter egos, as demonstrated above, the two Defendants are jointly and severally liable to remit back pay to those applicants who were

properly on the out of-work list during the relevant time period in order to make them whole. *See Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d at 930. As the applicants' exclusive bargaining representative, the Union shall take responsibility for seeing that any and all damages recovered on their behalf are distributed to the rightful recipients. Defendants must also pay delinquent Industry Advancement Funds to the Union. (Unc. Facts ¶ 70.)

## V. CONCLUSION

The uncontroverted evidence demonstrates that Defendants are jointly and severally liable to Plaintiff Funds for unpaid contributions and to the Plaintiff Union, on behalf of its members, for unpaid union wages. Defendants are liable for a total of $143,842.92, based on covered work performed through September 8, 2001. That amount can be itemized as follows: $35,398.53 in unpaid contributions; $7,326.70 in liquidated damages ($3,786.88 accruing from September 2000 to January 2001; $3,539.82 accruing from January 2001 to September 8, 2001); $1,157.25 in accrued interest, through December 12, 2001; Defendants also owe $99,960.44 in unpaid wages. In addition, Plaintiffs are liable for Plaintiffs' attorney fees and costs, which have yet to be calculated and taxed. There are no genuine issues of material fact in this case and Plaintiffs are entitled to judgment as a matter of law, hence it is proper for the Court to enter summary judgment in favor of the Plaintiffs and against K.C. Excavating and G & C Excavating.

Respectfully submitted,

**BLAKE & UHLIG, P.A.**
2500 Holmes St.
Kansas City, MO 64108

By: /s/ Martin W. Walter
Martin W. Walter, #48867

**ATTORNEYS FOR PLAINTIFFS**



Case 4:01-cv-00087-SOW Document 36 Filed 12/28/01 Page 44 of 44